UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| GEORGE HARDEN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:16-cv-95 RLM-SLC |
| | ) | |
| OMNISOURCE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

George Harden sues his former employer, OmniSource, for discriminating against him on the basis of his race or color, in violation of Title VII of the Civil Rights Act of 1964. OmniSource moved for summary judgment and the court grants OmniSource's motion.

I. BACKGROUND

Mr. Harden, an African-American, worked for OmniSource as a "grader." He was transferred to work indoors in the company's nonferrous division, where he assisted customers in loading and unloading materials.

While in that position for about a year, Justin Young, another OmniSource employee, showed Mr. Harden a post on the fantasy football website in which OmniSource employees participated. The post was from John Lauer, Mr. Harden's supervisor, who referred to Mr. Harden as "the nigger" who makes the carrot cake. Mr. Harden brought this post to the attention of Scott Saunders, an even higher supervisor.

Mr. Saunders had Mr. Harden transferred to an outdoors position in the ferrous division, where Mr. Harden continued to assist customers in loading and unloading their vehicles. According to Mr. Harden, Mr. Saunders transferred him because he "didn't get along with guys inside." In his earlier position, Mr. Harden had also received disciplinary warnings involving altercations with coworkers. About six months after the transfer, OmniSource terminated Mr. Harden's employment; Mr. Harden alleges it did so because of his race or color, or in retaliation for raising the derogatory comment with his supervisor, Mr. Saunders.

During the last three months of Mr. Harden's job at OmniSource, he received four different written warnings from his supervisor, Mr. Saunders. On January 12, 2015, Mr. Saunders warned Mr. Harden in writing for not having a customer sign a hold harmless agreement before unloading materials from the customer's vehicle. According to the warning, Mr. Harden had been reminded of this requirement "countless times before." Mr. Harden said he had been told previously about the requirement to have the customer sign a hold harmless agreement. When Mr. Harden was unloading materials from the customer's trailer, a piece of metal broke the customer's taillight.

The parties dispute how employees are expected to know of the requirement to obtain a hold harmless agreement. OmniSource says that this requirement was included in employee training and that Mr. Saunders explained the requirement to Mr. Harden. Mr. Harden doesn't seem to dispute the latter,

but claims that the requirement wasn't in writing. Regardless, both parties acknowledge that Mr. Harden knew of this requirement.

On February 16, 2015, Mr. Saunders warned Mr. Harden for not completing daily inspection reports and for not maintaining enough distance from crane operators while the crane was in use. Employees aren't supposed to be within 25 feet of a crane while it's in magnetized mode. Mr. Saunders gave Mr. Harden a written warning that listed "Grader Expectations," including "[f]ill[ing] out twice daily inspection reports." The warning says that the graders were trained in these procedures during the previous week. Mr. Harden says he was still in training during the incident.

Mr. Harden also says he was expected to stay with the customer during unloading, but that if he stayed with the customer, he would have to be within the 25-foot safety zone. OmniSource says that it's not a problem for an employee to be within 25 feet of the crane while with a customer, because the operator would know of the employee's location and not be in the operator's blind spot. Mr. Harden applies the same reasoning to the 'warming hut' in which graders sometimes stand. He says that the warming hut is within 25 feet of the crane, so standing in the hut would always violate the rule. OmniSource responds that the hut is about 50 feet from the crane, and even if it weren't, the hut would be visible to the crane operator.

On February 26, 2015, Mr. Saunders warned Mr. Harden in writing and suspended him for three days for violating a cardinal safety rule. The warning said he "intentionally entered into the blind spot of a running material handler."

It also explained that this requirement is in Mr. Harden's safety handbook, which he signed, and that Mr. Saunders and Mr. Harden have had numerous discussions about work performance and safety. Mr. Harden agrees that he was within 25 feet of the crane without having made eye contact with the crane operator to ensure that he could move safely through the area. Mr. Harden says he was leaving the facility at the time and the crane moved into his vicinity.

Last, on April 28, 2015, Mr. Saunders gave Mr. Harden a written warning saying that Mr. Harden didn't stay with a customer while unloading, as required. The customer asked if he could unload a filing cabinet using the crane. Mr. Harden and the crane operator didn't have the customer sign a hold harmless agreement. While unloading, the file cabinet fell off the crane and damaged the customer's taillight. Mr. Saunders said that during the previous week, he specifically discussed the hold harmless policy with Mr. Harden, and that he wouldn't tolerate Mr. Harden continuing to violate that policy. Mr. Saunders then terminated Mr. Harden's employment.[1]

Mr. Harden alleges that he was scrutinized more closely than his coworkers because of his race or color. Jason Jensen, a white crane operator and grader, broke the rear window of a customer's vehicle without having the customer sign a hold harmless agreement. According to OmniSource, Mr. Jensen

---

[1] The parties also describe other disciplinary incidents from years prior, while Mr. Harden was working under different supervision at one of OmniSource's other divisions. Both parties seem to agree that the earlier discipline is unrelated to Mr. Harden's termination in 2015 and the discrimination that he alleges.

received a written warning, but Mr. Harden says Mr. Jensen wasn't disciplined.[2]

Johnell Hogue, the African-American crane operator during the April 2015 incident, also didn't have the customer sign a hold harmless agreement. Mr. Harden claims Mr. Hogue wasn't disciplined for this.[3] OmniSource says he received a written warning. About a month before Mr. Harden's termination, Jonathan Hostetler, a white grader,[4] was also terminated for safety violations. Mr. Harden also maintains that he filled out daily inspection reports as required, but that graders who didn't, such as Mr. Hogue and Allen Underwood, also an African American, received no discipline. Mr. Harden maintains that Mr. Underwood also damaged the taillight of a truck and wasn't disciplined.

Mr. Harden filed a charge of discrimination with the EEOC. He then brought his Title VII action in state court, which OmniSource removed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material

---

[2] OmniSource argues that this statement should be stricken as hearsay. Mr. Harden's response brief also contradicts his own assessment, saying that "Jason Jensen received a written warning for customer damage and was not terminated."

[3] Mr. Harden doesn't provide foundation as to his personal knowledge on this point. His being present at the time of the crane incident wouldn't give him any knowledge about whether Mr. Hogue received a written warning. Later in Mr. Harden's response brief, he also contradicts himself, saying that "Johnell Hogue received a written warning and was not terminated."

[4] Mr. Harden vacillates on his description of Mr. Hostetler's skin color during the deposition. First, he said Mr. Hostetler is "white, I guess." After going on about whether Mr. Harden can determine a person's race or nationality, Mr. Harden then said Mr. Hostetler's skin color is the same color as the attorney's. He then said he "wouldn't call it white," but would call it "very light brown." Later on, Mr. Harden describes another employee's color as "[s]ame color as [the attorney's], he's white, I guess." Mr. Harden's statements seem to recognize that Mr. Hostetler has a complexion consistent with a Caucasian or white person. Harden Aff. at 45-49.

fact, such that the movant is entitled to judgment as a matter of law. Protective Life Ins. Co. v. Hansen, 632 F.3d 388, 391-92 (7th Cir. 2011). I must construe the evidence and all inferences that reasonably can be drawn from the evidence in the light most favorable to Mr. Harden, the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). As the moving party, OmniSource bears the burden of informing me of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If OmniSource meets that burden, Mr. Harden can't rest upon the allegations in the pleadings, but must "point to evidence that can be put in admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." Marr v. Bank of Am., N,A., 662 F.3d 963, 966 (7th Cir. 2011); *see also* Hastings Mut. Ins. Co. v. LaFollette, No. 1:07-cv-1085, 2009 WL 348769, at *2 (S.D. Ind. Feb. 6, 2009) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."); Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").

## III. DISCUSSION

Summary judgment is appropriate when the record demonstrates that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When construing the evidence in the light most favorable to Mr. Harden, he can't prevail on his discrimination or retaliation claims, so OmniSource is entitled to summary judgment.

## A. Discrimination Claim

The sole question for Mr. Harden's discrimination claim is "[w]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [or color] . . . caused the discharge . . . ." Ortiz v. Werner Enters., Inc., 834 F.3d 760, 765 (7th Cir. 2016). Mr. Harden can show this through direct or indirect evidence. *Id.* The framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), sets up one "means of organizing, presenting, and assessing circumstantial evidence." David v. Bd. of Trustees, 846 F.3d 216, 224 (7th Cir. 2017). It gives the plaintiff "the initial burden of producing evidence showing that (1) [ ]he is a member of a protected class, (2) [ ]he was meeting the defendant's legitimate expectations, (3) [ ]he suffered an adverse employment action, and (4) similarly situated employees who were not members of h[is] protected class were treated more favorably." Simpson v. Franciscan Alliance, Inc., 827 F.3d 656, 661 (7th Cir. 2016). The burden then "shift[s] to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the

employer's explanation is pretextual." *Id.* The ultimate question remains the same, though. Answering it isn't limited to *McDonnell Douglas'* method of proof.

Mr. Harden relies on the different treatment of "similarly situated employees" to support his claim. Even if Mr. Harden was disciplined more severely than his colleagues, nothing suggests that this disparity had anything to do with his race or color. Even if the inconsistencies in his own briefs are interpreted in his favor, Mr. Hostetler, a white grader, was terminated for safety violations about a month before Mr. Harden. Mr. Harden argues that Mr. Hogue and Mr. Underwood didn't file daily inspection reports and weren't reprimanded. But both of these comparators are African-American, so if Mr. Harden was treated worse than they, there's no reason to think it had to do with his race or color. According to Mr. Harden, one of these two was the same skin-tone as Mr. Harden, and the other was a lighter shade of brown. But Mr. Harden's evidence doesn't indicate that employees with lighter complexions were treated less severely than those with darker complexions.

Mr. Harden also points to Mr. Jensen, a white crane operator and grader, who broke the rear window of a customer's vehicle without having the customer sign a hold harmless agreement; and to Mr. Hogue, an African-American crane operator, who operated the crane with Mr. Harden the last time a customer's taillight was broken, also without a hold harmless agreement. Mr. Harden vacillates on whether these men were reprimanded at all. But even if they weren't, this inconsistency in enforcement shows no connection to Mr. Harden's

race or color, because one of the two comparators offered has the same race and color as Mr. Harden.

Further, "[a]n employee who does not have a similar disciplinary history and performance records as the plaintiff is not similarly situated." Simpson v. Franciscan Alliance, 827 F.3d at 662. That these men weren't terminated might easily be attributed to differences in disciplinary history. Mr. Harden presents no evidence on their history. Mr. Harden had four written warnings in three months, which could easily differentiate him from those who were treated less severely.

All of this assumes the admissibility of Mr. Harden's beliefs about whether these men were disciplined without any additional foundation. OmniSource claims that Mr. Jensen and Mr. Hogue each received written warnings and contests the admissibility of some of Mr. Harden's statements. The court needn't reach that issue because it must resolve the motion in OmniSource's favor even if Mr. Harden's statements are treated as admissible and interpreted in the light most favorable to him.

Put into the *McDonnell Douglas* framework, Mr. Harden is, as an African-American, a member of a protected class. Simpson v. Franciscan Alliance, Inc., 827 F.3d 656, 661 (7th Cir. 2016). If the evidence is interpreted in the light most favorable to him, it's possible for a factfinder to conclude that he was meeting OmniSource's legitimate expectations when he was fired. *Id.* During the first and fourth relevant incidents, Mr. Harden acknowledged that he knew of the requirement to have customers sign a hold harmless agreement, but didn't follow

it. But there's at least a genuine issue as to whether Mr. Harden broke with policy during the second and third incidents. According to Mr. Harden, he wasn't trained in the appropriate distance to keep from the crane during the second incident, and it was impossible to comply with this requirement while also complying with the requirement to stay with the customer. He says he couldn't have maintained proper distance from the crane during the third incident because the crane approached him as he was leaving. It's possible for a reasonable factfinder to conclude that the two incidents when Mr. Harden indisputably violated policy weren't enough, on their own, to fall below OmniSource's legitimate expectations of an employee before termination.

But even if Mr. Harden can get this far, he can't get past the third portion of the *McDonnell Douglas* framework, that "similarly situated employees who were not members of h[is] protected class were treated more favorably." *Id.* For the reasons already described, Mr. Harden's comparators don't show more favorable treatment for white employees or do show similar treatment for people of the same race or color as Mr. Harden.

No reasonable factfinder could determine that Mr. Harden's race or color motivated his termination, and so the court grants OmniSource summary judgment on this claim.

### B. Retaliation Claim

A plaintiff can prove a Title VII retaliation claim through direct or indirect methods. Mr. Harden seems only to use the direct method, through which the

plaintiff must "show[ ] (1) that [ ]he engaged in statutorily protected activity, (2) that [ ]he suffered an adverse action taken by h[is] employer, and (3) a causal connection between the two." Jones v. Res-Care, Inc., 613 F.3d 665, 670-671 (7th Cir. 2010). Mr. Harden tries to show that, after he reported the racially derogatory remark to Mr. Saunders, Mr. Saunders retaliated. He says he Mr. Saunders transferred him to his current position, where he was then reprimanded several times and ultimately fired.

The "statutorily protected activity" in this case would be reporting the derogatory remark. *See* Davis v. Time Warner Cable of Se. Wis., L.P., 651 F.3d 664, 674 (7th Cir. 2011) ("[A]n informal complaint may constitute protected activity for purposes of retaliation claims."). The "adverse action" would be Mr. Harden's termination. *See* Jones v. Res-Care, 613 F.3d at 671 ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some *tangible* job consequence, do not constitute adverse employment actions."). But Mr. Harden doesn't present evidence that would allow a reasonable trier of fact to find that the protected activity caused the adverse action.

In strict but-for causation: had Mr. Harden not reported the derogatory comment, then Mr. Saunders might not have felt the need to transfer him to work with a different group of employees, which might have not have led to Mr. Saunders being his direct supervisor, which might not have led to Mr. Saunders disciplining him several times, which might have not led to his termination. But that's not the kind of causation needed. Mr. Harden needs evidence that Mr.

Saunders chose to terminate him in response to reporting the derogatory comment. Nothing suggests that Mr. Saunders did so.

Mr. Harden agrees that on two occasions he didn't have a customer sign a hold harmless agreement, only before material fell that damaged the customer's vehicle. Mr. Harden agrees that he knew about this obligation. Mr. Harden quibbles about whether he could have avoided violating the requirement to maintain a safe distance from the crane. But even if he's right, nothing suggests Mr. Saunders used that rule against him in response to Mr. Harden's protected activity. This is especially the case when Mr. Hostetler seems to have been terminated for similar safety violations. As already explained, there's not enough evidence for a reasonable factfinder to find that Mr. Harden was targeted for discipline any more than his coworkers. Without evidence to support causation, the retaliation claim can't succeed before a reasonable factfinder, and so the court grants OmniSource summary judgment on this claim too.

## IV. CONCLUSION

Without evidence that Mr. Harden was treated differently than comparable coworkers or that his protected activity caused the termination, the court GRANTS OmniSource's motion for summary judgment [Doc. No. 25], DENIES AS MOOT OmniSource's motion to strike [Doc. No. 29], VACATES the May 15, 2017 pretrial conference and May 30, 2017 trial, and DIRECTS the Clerk to enter judgment accordingly.

SO ORDERED.

ENTERED:  <u>May 4, 2017</u>

<u> /s/ Robert L. Miller, Jr.</u>
Judge
United States District Court
